592

[848 NE2d 463, 815 NYS2d 16]

LARRY BARD et al., Appellants, v REINHARDT JAHNKE, Individually and Doing Business as HEMLOCK VALLEY FARMS, Respondent, et al., Defendant.

Argued March 21, 2006; decided May 2, 2006

**POINTS OF COUNSEL**

*Law Firm of Scarzafava & Basdekis,* Oneonta (*John Scarzafava* of counsel), for appellants. There are two separate and distinct causes of action which relate to injuries caused by domestic animals: strict liability and negligence. (*Loder v State of New York,* 200 AD2d 925; *Gaccione v State of New York,* 173 Misc 367; *Colarusso v Dunne,* 286 AD2d.37; *Hyland v Cobb,* 252 NY 325; *St. Germain v Dutchess County Agric. Socy.,* 274 AD2d 146; *Silva v Micelli,* 178 AD2d 521; *Stoop v Kurtz,* 121 AD2d 529; *Panzer v Harding,* 118 AD2d 842; *Kennet v Sossnitz,* 260 App Div 759.)

*Hickey, Sheehan & Gates, P.C.,* Binghamton (*Thomas J. Hickey* of counsel), for respondent. I. There is one distinct cause of action for injuries caused by domestic animals in the State of New York: one based on strict liability. (*Collier v Zambito,* 1 NY3d 444; *Velazquez v Carns,* 244 AD2d 620; *Wilson v Whiteman,* 237 AD2d 814; *Shaw v Burgess,* 303 AD2d 857; *Schwartz v Armand Erpf Estate,* 255 AD2d 35; *Benoit v Troy & Lansingburgh R.R. Co.,* 154 NY 223; *Brown v Willard,* 303 NY 727; *Plennert v Abel,* 269 AD2d 796; *Lynch v Nacewicz,* 126 AD2d 708; *Smith v Farner,* 229 AD2d 1017.) II. There are no facts to support a claim that Reinhardt Jahnke owed Larry Bard an enhanced duty. (*Loder v State of New York,* 200 AD2d 925; *Shaw v Burgess,* 303 AD2d 857; *Smith v Farner,* 229 AD2d 1017; *Plennert v Abel,* 269 AD2d 796; *Schwartz v Armand Erpf Estate,* 255 AD2d 35; *St. Germain v Dutchess County Agric. Socy.,* 274 AD2d 146; *Williams v City of New York,* 306 AD2d 203; *Grubenmann v Wagner,* 300 AD2d 443.) III. Motion Term Judge Patrick D. Monserrate has already applied a situational analysis to the facts of this case and found no cause of action. (*Turcotte v Fell,* 68 NY2d 432; *Pulka v Edelman,* 40 NY2d 781.) IV. The expert's affidavit submitted on behalf of Larry Bard is not sufficient to create a question of fact. (*Wilson v Whiteman,* 237 AD2d 814; *Palleschi v Granger,* 13 AD3d 871.)

**OPINION OF THE COURT**

READ, J.

The accident underlying this litigation occurred on September

27, 2001 at Hemlock Valley Farms in Otsego County, a dairy farm owned and operated by defendant Reinhardt Jahnke and his wife in partnership with their two sons. At roughly 8:00 A.M., plaintiff Larry Bard, a self-employed carpenter, arrived at the farm to meet defendant John Timer, another self-employed carpenter. One of Jahnke's sons had asked Timer to repair ripped cow mattresses in a certain section—called the "low cow district"—of the farm's free-stall dairy barn. This large barn, which was divided into several sections, housed approximately 400 cows at the time, 130 of them in the low cow district. The repair work involved chiseling off the bolts fastening the damaged mattresses to the concrete base of a stall, stretching the mattresses and then refastening the bolts. Timer had asked Bard the day before if he would be interested in helping him carry out this task, and Bard had replied that he would.

Timer, who had performed carpentry and odd jobs on the farm for about four or five years, walked Bard through the dairy barn, pointing out some of the projects that he had completed and where the milking parlor was. Timer took Bard to the barn's low cow district, told him how to start the mattress repairs, and then left to complete another chore, planning to return shortly. Neither Timer nor Bard saw a bull; Bard testified that he saw no farm animals at all in the barn when he walked through it with Timer. From his previous work at the farm, Timer knew there was a bull at another barn about a quarter-mile distant from the dairy barn. Prior to Bard's accident, he did not know that at all times there was a bull present in the dairy barn's low cow district.

Bard retrieved some tools from his truck and started to work at about 8:30 A.M. He testified that a number of cows wandered into the area as he was working. Further, he was "familiar with working in and around cows," which would "come up, drool on you, lick on you and everything else," and that he didn't "usually pay much attention to them." At about 9:00 A.M., as Bard was down on his knees removing bolts, he first noticed a bull "[w]hen he stepped in behind him" and "bellered" within a distance of two to three feet. Bard testified that he "slowly kind of looked around, and didn't know what to do at that point." As he "went to stand up," the bull "took [him] in the chest. [The bull] charged [him] then [and] proceeded to start slamming [him] into the pipes" in the stall. No one else was present in the low cow district at the time. Neither Jahnke nor anyone else associated with the farm knew ahead of time that Timer planned

to repair the mattresses that day, or that Bard would be working for Timer to carry out this task.

Bard pulled himself outdoors through an opening at the bottom of the barn, and crawled over to his truck, where he lay for "quite awhile to get some wind and establish what was going on." He caught the attention of someone working in the field, whom he asked to call an ambulance. Bard's injuries included fractured ribs, a lacerated liver and exacerbation of a preexisting cervical spine condition.

The hornless dairy bull who injured Bard was named Fred. He was about 1½ years old, and had been the resident "cleanup" bull at the farm for at least six months prior to September 27, 2001. The cows and heifers on the farm are bred by artificial insemination. Fred was housed and roamed freely in the low cow district of the dairy barn so that he might impregnate cows stabled there who had failed to conceive by artificial insemination. Before this accident, Fred had concededly never threatened or injured any other farm animal or human being. As was the case with all the dairy bulls ever owned by Jahnke, a longtime dairy farmer, Fred was never chained, caged or barricaded within the barn. Prior to September 27, 2001, none of the bulls on any of the farms worked on or owned by Jahnke had ever acted aggressively toward, or injured, another farm animal or human being.

Bard, with his wife suing derivatively, commenced an action against both Jahnke and Timer to recover damages for his personal injuries, alleging causes of action sounding in strict liability and negligence. Plaintiffs subsequently moved for summary judgment on liability, and defendants cross-moved for summary judgment dismissing the complaint. Ruling on defendant's cross motion,[1] Supreme Court first observed that New York's appellate courts had been "markedly consistent" in applying the common-law vicious propensity rule to decide whether owners of dogs and cats were liable for injuries caused by their animals. Citing Restatement (Second) of Torts § 518 and prior cases in the Appellate Division, however, the court concluded that a different rule applied to owners of domestic animals other than dogs and cats. According to Supreme Court, these owners are subject to "some duty of enhanced care" to restrain or confine the animal or to warn a human being who

---

1. Plaintiffs withdrew their motion for summary judgment at oral argument.

might come into contact with it. Applying this rule to the facts, Supreme Court granted defendants' motions for summary judgment because Jahnke did not know that Bard would be at his farm or working in the dairy barn, and Timer was unaware of the cleanup bull's presence in the barn.

The Appellate Division affirmed, but on a different basis altogether. Noting that a bull is a domestic animal as defined in Agriculture and Markets Law § 108 (7) and citing our recent decision in *Collier v Zambito* (1 NY3d 444 [2004]), the Court concluded that Jahnke was not liable for Bard's injuries unless he knew or should have known of the bull's vicious or violent propensities. The Court noted that the record contained no evidence of this, and "[t]o the contrary, it contains competent evidence establishing that, prior to [Bard's] accident, the subject bull had never injured another person or animal or behaved in a hostile or threatening manner" (16 AD3d 896, 897 [3d Dept 2005]).

Bard had submitted the affidavit of a professor of animal science, who opined that "bulls, in particular breeding bulls, are generally dangerous and vicious animals," and that therefore Jahnke should have restrained the bull or warned Bard of its presence (*id.*). The Court found this affidavit unavailing, especially in light of its "consistent[ ], and recently[ ] reiterated" view that "the particular type or breed of domestic animal alone is insufficient to raise a question of fact as to vicious propensities" (*id.* [internal quotation marks and citations omitted]).

Finally, with respect to Bard's negligence claim, the Appellate Division noted that it had "considered and decline[d] to adopt the enhanced duty rule espoused under certain limited circumstances by the First and Second Departments" (*id.* at 898). Bard subsequently sought to appeal so much of the Court's order as affirmed the grant of summary judgment to Jahnke. We granted him leave to appeal, and now affirm on the ground adduced by the Appellate Division.

Only two years ago, in *Collier*, we restated our long-standing rule

> "that the owner of a domestic animal who either knows or should have known of that animal's vicious propensities will be held liable for the harm the animal causes as a result of those propensities. Vicious propensities include the propensity to do any act that might endanger the safety of the

persons and property of others in a given situation"
(*Collier*, 1 NY3d at 446 [internal quotation marks
and citations omitted]; *see also* NY PJI 2:220
[2006]).

Once this knowledge is established, the owner faces strict liability.[2] We made two additional points in *Collier*, which bear repeating.

First, while knowledge of vicious propensities "may of course be established by proof of prior acts of a similar kind of which the owner had notice," a triable issue of fact as to whether the owner knew or should have known that its animal harbored vicious propensities may be raised by proof of something less (*Collier*, 1 NY3d at 446). In *Collier*, a case in which a dog bit a child, we gave the example of evidence that a dog had, for example, "been known to growl, snap or bare its teeth," or that "the owner chose to restrain the dog, and the manner in which the dog was restrained" (*id.* at 447).

> "In addition, an animal that behaves in a manner
> that would not necessarily be considered dangerous
> or ferocious, but nevertheless reflects a proclivity to
> act in a way that puts others at risk of harm, can be
> found to have vicious propensities—albeit only when
> such proclivity results in the injury giving rise to
> the lawsuit" (*id.*).

Here, Fred had never attacked any farm animal or human being before September 27, 2001. He had always moved unrestrained within the limits of the barn's low cow district, regularly coming into contact with other farm animals, farm workers and members of the Jahnke family without incident or hint of hostility. He had never acted in a way that put others at risk of harm. As a result, Bard cannot recover under our traditional rule.

Bard therefore argues alternatively that he can recover under a common-law cause of action for negligence, as expressed in Restatement (Second) of Torts § 518, Comments *g* and *h*. This common-law cause of action is, he claims, separate and apart from and in addition to our traditional rule.

---

2. Our rule is virtually identical to Restatement (Second) of Torts § 509 (1) (1977): "A possessor of a domestic animal that he knows or has reason to know has dangerous propensities abnormal to its class, is subject to liability for harm done by the animal to another, although he has exercised the utmost care to prevent it from doing the harm."

Section 518 provides generally that the owner of a domestic animal, which the owner does not know or have reason to know to be abnormally dangerous, is nonetheless liable if he intentionally causes the animal to do harm, or is negligent in failing to prevent harm. Comment *g, "Knowledge of normal characteristics"* provides that

> "[i]n determining the care that the keeper of a not abnormally dangerous domestic animal is required to exercise to keep it under control, the characteristics that are normal to its class are decisive, and one who keeps the animal is required to know the characteristics. Thus the keeper of a bull or stallion is required to take greater precautions to confine it to the land on which it is kept and to keep it under effective control when it is taken from the land than would be required of the keeper of a cow or gelding."

Comment *h, "Animals dangerous under particular circumstances"* states that

> "[o]ne who keeps a domestic animal that possesses only those dangerous propensities that are normal to its class is required to know its normal habits and tendencies. He is therefore required to realize that even ordinarily gentle animals are likely to be dangerous under particular circumstances and to exercise reasonable care to prevent foreseeable harm. Thus the keeper of even a gentle bull must take into account the tendencies of bulls as a class to attack moving objects and must exercise greater precautions to keep his bull under complete control if he drives it upon a public highway. So, too, the keeper of an ordinarily gentle bitch or cat is required to know that while caring for her puppies or kittens she is likely to attack other animals and human beings."

Building on these provisions and their specific references to bulls, Bard contends that because Fred was not only a bull, but a breeding bull housed with the herd over whom he exercised dominance, Jahnke was negligent in failing to restrain Fred,[3] or to warn non-farm personnel of his presence. But this is no dif-

---

3. Fred was, of course, restricted to the low cow district of the barn. He was not, in any sense, "loose": he neither escaped nor was he taken from the

ferent from arguing that Jahnke was negligent in that he *should have known* of Fred's vicious propensities because—as plaintiffs' expert put it—"bulls, in particular breeding bulls, are generally dangerous and vicious animals." (16 AD3d at 897.)

As already noted, an animal's propensity to cause injury may be proven by something other than prior comparably vicious acts. As a result, a common shorthand name for our traditional rule—the "one-bite rule"—is a misnomer. We have never, however, held that particular breeds or kinds of domestic animals are dangerous, and therefore when an individual animal of the breed or kind causes harm, its owner is charged with knowledge of vicious propensities. Similarly, we have never held that male domestic animals kept for breeding or female domestic animals caring for their young are dangerous as a class. We decline to do so now, or otherwise to dilute our traditional rule under the guise of a companion common-law cause of action for negligence. In sum, when harm is caused by a domestic animal, its owner's liability is determined solely by application of the rule articulated in *Collier*.

Accordingly, the order of Appellate Division should be affirmed, with costs.

R.S. SMITH, J. (dissenting). Under the Restatement (Second) of Torts, the owner of a domestic animal who does not know or have reason to know that the animal is more dangerous than others of its class may still be liable for negligently failing to prevent the animal from inflicting an injury. This Court today becomes the first state court of last resort to reject the Restatement rule. I think that is a mistake. It leaves New York with an archaic, rigid rule, contrary to fairness and common sense, that will probably be eroded by ad hoc exceptions.

In this case, as the majority seems to recognize, a jury could have found Jahnke to be negligent, though he had no reason to think that Fred was any more dangerous than any other breeding bull. An expert's affidavit provides the unsurprising information that all breeding bulls are dangerous, because they "have high libido," and "will challenge or attack . . . unknown individuals, in order to establish dominance over the herd." Jahnke knew that Fred was in the low cow district of the dairy barn, and a jury could have found that he was negligent in fail-

confines within which he was normally kept, and he was not driven upon a public highway, the specific situations referenced in Comments *g* and *h*, respectively.

ing to impart this information to Timer; Jahnke knew that Timer worked in that barn from time to time, though he did not know that Timer had arranged for Bard to work there on the day of the accident. The record shows that, if Timer or Bard had known of Fred's presence, either of them could easily have erected a partition to exclude Fred from the area where Bard was working.

Thus, if ordinary negligence principles apply here, this case should not have been dismissed. The Restatement says that ordinary negligence principles do apply: With exceptions not relevant here, "one who possesses or harbors a domestic animal that he does not know or have reason to know to be abnormally dangerous, is subject to liability for harm done by the animal if, but only if . . . he is negligent in failing to prevent the harm" (Restatement [Second] of Torts § 518 [b] [1977]). The Comments to this Restatement section, quoted in the majority opinion (at 598), point out the application of this rule specifically to bulls: "the keeper of a bull or stallion is required to take greater precautions . . . than . . . the keeper of a cow or gelding" (Restatement [Second] of Torts § 518, Comment *g*); "the keeper of even a gentle bull must take into account the tendencies of bulls as a class to attack moving objects" (§ 518, Comment *h*).

Courts in at least 20 states appear to follow the Restatement rule (*e.g. White v Leeder*, 149 Wis 2d 948, 440 NW2d 557 [1989]; *Duren v Kunkel*, 814 SW2d 935 [Mo 1991] [en banc]; *Gardner v Koenig*, 188 Kan 135, 360 P2d 1107 [1961]; *Sybesma v Sybesma*, 534 NW2d 355 [SD 1995]).* The only court outside New York to have ruled otherwise, so far as I know, is the Georgia Court of Appeals (*Testamentary Trust of Moseley v Barnes*, 245 Ga App 817, 538 SE2d 873 [2000]). In New York, the departments of the

---

* Other cases include: *Baker v McIntosh* (132 SW3d 230 [Ky 2004]); *Savory v Hensick* (143 SW3d 712 [Mo Ct App 2004]); *Borns ex rel. Gannon v Voss* (70 P3d 262 [Wyo 2003]); *Gehrts v Batteen* (620 NW2d 775 [SD 2001]); *Moura v Randall* (119 Md App 632, 705 A2d 334 [1998]); *Jividen v Law* (194 W Va 705, 461 SE2d 451 [1995]); *Trager v Thor* (445 Mich 95, 516 NW2d 69 [1994]); *Dunnings v Castro* (881 SW2d 559 [Tex Ct App 1994]); *Ross v Lowe* (619 NE2d 911 [Ind 1993]); *Humphries v Rice* (600 So 2d 975 [Ala 1992]); *Andrade v Shiers* (564 So 2d 787 [La Ct App 1990]); *DeRobertis v Randazzo* (94 NJ 144, 462 A2d 1260 [1983]); *Rickrode v Wistinghausen* (128 Mich App 240, 340 NW2d 83 [1983]); *Medlyn v Armstrong* (49 Or App 829, 621 P2d 81 [1980]); *Arnold v Laird* (94 Wash 2d 867, 621 P2d 138 [1980]); *Griner v Smith* (43 NC App 400, 259 SE2d 383 [1979]); *Vigue v Noyes* (113 Ariz 237, 550 P2d 234 [1976]); *Huber v Timmons* (184 Neb 718, 171 NW2d 794 [1969]); and *Saldi v Brighton Stock Yard Co.* (344 Mass 89, 181 NE2d 687 [1962]).

Appellate Division are divided on this issue. The Second Department has allowed negligence recovery (*e.g. St. Germain v Dutchess County Agric. Socy.*, 274 AD2d 146 [2d Dept 2000]), as has the First Department in some circumstances (*e.g. Schwartz v Armand Erpf Estate*, 255 AD2d 35 [1st Dept 1999]). The Third and Fourth Departments have rejected negligence recovery (*Shaw v Burgess*, 303 AD2d 857 [3d Dept 2003]; *Smith v Farner*, 229 AD2d 1017 [4th Dept 1996]), though an earlier Third Department case had allowed it (*Lecznar v Sanford*, 265 AD2d 728 [3d Dept 1999]).

Before today, our Court's opinions were consistent with the Restatement rule. Our most recent case involving animal-inflicted injuries, *Collier v Zambito* (1 NY3d 444 [2004]), did not address the question of whether general negligence principles were applicable in such cases. *Collier* involved the rule, correctly stated by the majority here, that an owner who knows or has reason to know of an animal's dangerous propensities faces strict liability (majority op at 596-597; *accord* Restatement [Second] of Torts § 509 [1977]). The only issue in *Collier* was whether the defendant should have known of the dangerous propensities of her dog. Probably most cases involving cats and dogs will turn, as *Collier* did, on this issue; when the owner of a household pet has no reason to think the animal unusually aggressive, there will often be no basis for a finding of negligence. Our more relevant decisions are older ones, most of them involving bulls and horses.

No opinion of our Court before today announced the rule, now adopted by the majority, that the strict liability involved in *Collier* is the only kind of liability the owner of a domestic animal may face—that, in other words, there is no such thing as negligence liability where harm done by domestic animals is concerned. This rule was stated, before our Court existed, by the Supreme Court of Judicature in a case involving a horse gored by a bull: "If damage be done by any domestic animal, kept for use or convenience, the owner is not liable to action on the ground of negligence, without proof that he knew that the animal was accustomed to do mischief" (*Vrooman v Lawyer*, 13 Johns 339 [1816]). Cases after 1816, however, gave reason to doubt this statement was correct.

Thus in *Dickson v McCoy* (39 NY 400, 401 [1868]), a case involving a horse turned loose in a public street, Judge Dwight of our Court stated a rule like that of the Restatement: "It is not necessary that a horse should be vicious to

make the owner responsible for injury done by him through the owner's negligence." (*See* Restatement [Second] of Torts § 518, Comment *e.*) In *Benoit v Troy & Lansingburgh R.R. Co.* (154 NY 223, 227 [1897]), we rejected liability in a case where horses had run out of control in the street, but left open the possibility of recovery based on negligence in a proper case, saying that an owner who did not know his horses to be vicious could not be liable "in the absence of negligence." And in *Hyland v Cobb* (252 NY 325, 326-327 [1929]), though again ruling for the defendant, we cited *Dickson* for the proposition that "negligence by an owner, even without knowledge concerning a domestic animal's evil propensity, may create liability." Concededly, we later affirmed without opinion two Appellate Division cases that seem to stand for a narrower rule (*Kennet v Sossnitz*, 260 App Div 759 [1st Dept 1940], *affd* 286 NY 623 [1941]; *Brown v Willard*, 278 App Div 728 [3d Dept 1951], *affd* 303 NY 727 [1951]). Nevertheless, it is surprising to find today's Court rejecting the Restatement and the overwhelming weight of authority in other states, in favor of a rule stated 190 years ago that we have never otherwise endorsed.

For all the faults of modern tort law, and they are many, I do not think that this attempt to cling to the certainties of a distant era will work out well. The rule the majority adopts is contrary to simple fairness. Why should a person who is negligent in managing an automobile or a child be subject to liability, and not one who is negligent in managing a horse or bull? Why should a person hit by a subway train be able to recover and one hit by a breeding bull be left without a remedy? I think there are no good answers to these questions, and it is possible to imagine future cases that will put the rule adopted by the majority under strain. Suppose, for example, a variation on the facts of *Collier*: What if defendant there had encouraged a child to play not with a grown dog, but with a litter of puppies, thus predictably provoking an otherwise gentle mother dog to rage? Or suppose facts like those in *Duren v Kunkel* (814 SW2d 935 [Mo 1991] [Holstein, J.]), where a bull was stirred to attack because his owner negligently caused him to be driven through an area where fresh blood was on the ground? In such a case, we could either deny recovery to a deserving plaintiff, despite negligence more blatant than what Jahnke is accused of here, or we could invent a "mother dog" exception or a "fresh blood"

exception to the rule adopted in this case. I think it would be wiser to follow the Restatement rule, as has almost every other state that has considered the question.

Chief Judge KAYE and Judges CIPARICK and GRAFFEO concur with Judge READ; Judge R.S. SMITH dissents and votes to reverse in a separate opinion in which Judges G.B. SMITH and ROSENBLATT concur.

Order affirmed, with costs.