[910 NE2d 993, 883 NYS2d 164]

Melanie Petrone, Respondent, v Bernard Fernandez, Defendant, and James McCloy, Appellant.

Argued May 7, 2009; decided June 9, 2009

## POINTS OF COUNSEL

*Terence F. Gilheany,* New York City, and *Bailey & Sherman, P.C.,* Douglaston, for appellant. The Appellate Division's order, insofar as appealed from, should be reversed, and defendant-appellant James McCloy should be granted summary judgment dismissing the remaining common-law negligence cause of action. (*Bard v Jahnke,* 6 NY3d 592; *Alia v Fiorina,* 39 AD3d 1068.)

*Law Offices of Michael A. Cervini,* Jackson Heights (*Michael A. Cervini* and *Robin Mary Heaney* of counsel), for respondent. I. Defendant's failure to restrain the dog and his violation of the leash law create a basis for liability even in the absence of proof of the rottweiler's vicious propensities. (*Bard v Jahnke,* 6 NY3d 592; *Hyland v Cobb,* 252 NY 325; *People ex rel. Knoblauch v Warden,* 216 NY 154.) II. Public policy requires the enforcement of New York City's leash law.

## OPINION OF THE COURT

READ, J.

On May 9, 2005, plaintiff Melanie Petrone, a mail carrier employed by the United States Postal Service, was making the rounds on a "drive-out" mail route in Douglaston, Queens. At about 11:30 A.M., she parked her Honda Accord along the side of a one-way roadway, directly across the street from the house where defendant James McCloy resided at the time. The house's front door is set back about 15 feet from the sidewalk, and the lawn slopes down toward the street. The lawn is unfenced. As plaintiff got out of her car, she observed at least two landscapers working on the house's lawn. After she had walked about six feet toward the house, plaintiff also saw a dog—defendant's then nine-year-old rottweiler—lying on the lawn, unleashed. She immediately "turned back to walk back to [her] vehicle,"

intending to skip the mail delivery because of the unrestrained dog, a postal procedure she called "flagging" a house.

According to plaintiff, when she was about four feet from her car, she "turned to see if the dog had moved and the dog had proceeded to run at [her] from the top of the hill"; and had come to within approximately six feet of her.* She "ran" the short remaining distance to her car, and "tried to jump through" the open window on the driver's side "[l]egs first." As plaintiff describes what she did, she "grabbed" the car and flung her right leg through the open window, jamming her right middle finger on "[t]he outside of the doorframe where the window comes down" as she executed this maneuver. She ended up stuck in an awkward position—with her right leg inside the car and her left leg outside—and "screaming . . . for someone to help." The dog was "[r]ight next to [her]," but "did not do anything." Plaintiff does not recall whether the dog ever barked at her. In other words, the dog did not bite or threaten or apparently make any contact whatsoever with plaintiff.

Plaintiff's cries attracted the landscapers' attention and assistance. And defendant, who was near the house, "yelled for the dog to come back," and the dog obeyed. Defendant then approached plaintiff, and they had a conversation that "was just about panic and [defendant] had come over to say that the dog's okay, he doesn't do anything," and plaintiff was "just very scared at that point. Just letting [defendant] know how nervous [she] was at that point."

Plaintiff handed defendant his mail, and continued on her rounds. Soon, however, she "felt pain" in her right middle finger, which "began to bruise." She called her shop steward to tell him what had happened and he, in turn, informed her manager. The manager met and accompanied plaintiff to a nearby medical facility where her injured finger was X-rayed, and diagnosed as "possibl[y] fracture[d]." As a result of this diagnosis, plaintiff's right middle finger was splinted for about five weeks, and taped to the adjoining finger for an additional week or so; no medication was ever prescribed to her for the injury. Plaintiff missed about six weeks of work, but was paid her full salary during the absence. At the time of her deposition, 10 months after the incident, plaintiff complained that the

---

* Defendant disputes that the dog ever left the lawn. This opinion is written based entirely on plaintiff's recounting of the facts, as given primarily in her deposition testimony.

finger "still ache[d]," especially in the "colder weather," and was "hard to bend . . . still." In addition, she could not "really put any pressure on it," and had "a hard time opening bottles." Plaintiff also was required to "vary [her] work" when "do[ing] what's called, 'finger[ing] the mail' " on account of the residual stiffness of her finger.

In September 2005, plaintiff sued defendant and the owner of the house for personal injuries as a result of her encounter with the dog. She alleged a first cause of action based on defendants' supposed knowledge of the dog's "prior history of vicious propensities"; and a second cause of action for negligence because of defendants' "violation of . . . laws, statute[s], regulation[s], and ordinance[s]." The second cause of action was essentially premised on the local leash law, section 161.05 (a) of the New York City Health Code (24 RCNY 161.05 [a]), which provides that "a person who owns, possesses or controls a dog shall not permit it to be in a public place or *in any open or unfenced area abutting on a public place* unless the dog is effectively restrained by a leash or other restraint not more than six feet long" (emphasis added).

In May 2006, the owner of the house sought summary judgment dismissing the complaint. Citing our decision in *Collier v Zambito* (1 NY3d 444 [2004]), he observed that there was "no indication that either of the defendants had any knowledge of any type of vicious propensities," or "that the dog[ ] in question actually did anything vicious." He also pointed out that he did not own the dog and was not present when the complained-of events took place. Defendant supported his codefendant's motion, stating that although plaintiff "trie[d] to distinguish this case by claiming 'common law negligence' . . . , it is or should be clear that, just as in a 'dog bite' case, a vicious propensity must be shown in an alleged 'dog chase' case," and that "[n]o such showing has or can be made."

Supreme Court issued a decision, dated November 29, 2006, granting the motion and, after searching the record, dismissing the complaint against both defendants. The court noted that the owner of the house had made out a prima facie case of entitlement to summary judgment by showing that he had no knowledge of the dog's vicious propensities; that "the dog, in fact, neither had vicious propensities nor behaved in a manner that reflect[ed] a proclivity to act in a way that put others at risk of harm"; and that "the dog's alleged conduct that resulted in plaintiff's injuries was not vicious or reasonably foreseeable."

Further, plaintiff failed to rebut this prima facie case "with evidence establishing either the existence of the [dog's] alleged vicious propensities or [the owner of the house's] knowledge thereof." Supreme Court opined that "the mere fact that the dog was unrestrained at the time of the subject incident [does] not raise a triable issue of fact as liability cannot be premised solely on the fact that defendant . . . left the dog unrestrained."

Plaintiff subsequently took an appeal, which she limited to the trial court's dismissal of her negligence cause of action against both defendants. The Appellate Division held, contrary to the Third Department's decision in *Alia v Fiorina* (39 AD3d 1068 [3d Dept 2007]), that a dog owner "may be held liable to a plaintiff based upon an alleged violation of a local leash ordinance and the dog's behavior, even though the dog ha[s] not displayed any prior vicious propensities" (*Petrone v Fernandez,* 53 AD3d 221, 222 [2d Dept 2008]). As a consequence, the court deleted the provision of Supreme Court's order which awarded summary judgment dismissing the negligence cause of action against defendant. The Appellate Division has asked us if this portion of its order was properly made, and we conclude that it was not.

"[W]hen harm is caused by a domestic animal, its owner's liability is determined *solely* by application of the rule articulated in *Collier*" (*Bard v Jahnke,* 6 NY3d 592, 599 [2006] [emphasis added])—i.e., the rule of strict liability for harm caused by a domestic animal whose owner knows or should have known of the animal's vicious propensities (*see Collier,* 1 NY3d at 446-447; *see also Bard,* 6 NY3d at 601 [R.S. Smith, J., dissenting] [objecting to "the rule . . . adopted by the majority, that the strict liability involved in *Collier* is the only kind of liability the owner of a domestic animal may face—that, in other words, there is no such thing as negligence liability where harm done by domestic animals is concerned"]). Just last year we unanimously affirmed an Appellate Division decision rejecting the notion that a negligence cause of action survives *Collier* and *Bard* (*see Bernstein v Penny Whistle Toys, Inc.,* 10 NY3d 787 [2008], *affg* 40 AD3d 224 [1st Dept 2007]). Here, defendant's violation of the local leash law is "irrelevant because such a violation is only some evidence of negligence, and negligence is no longer a basis for imposing liability" after *Collier* and *Bard* (*Alia,* 39 AD3d at 1069).

Accordingly, the order of the Appellate Division, insofar as appealed from, should be reversed, with costs; that part of

Supreme Court's order dismissing the second cause of action against defendant James McCloy should be reinstated; and the certified question should be answered in the negative.

Pigott, J. (concurring). I write separately to make clear that, while I concur with the majority in this case, I do so on constraint of *Bard v Jahnke* (6 NY3d 592 [2006]).

In *Bard*, the plaintiff, a carpenter, was injured by a bull that, for breeding purposes, was allowed to roam freely in the barn in which Bard was working. Bard submitted the affidavit of an animal science expert, who opined that "bulls, in particular breeding bulls, are generally dangerous and vicious animals," and that the farmer should have restrained the bull or warned Bard of its presence (*id.* at 596).

The Court endorsed the standard proposition that "an animal that behaves in a manner that would not necessarily be considered dangerous or ferocious, but nevertheless reflects a proclivity to act in a way that puts others at risk of harm, can be found to have vicious propensities" (*Bard*, 6 NY3d at 597, quoting *Collier v Zambito*, 1 NY3d 444, 447 [2004]), giving rise to strict liability. The Court found, however, that the bull had regularly come into contact with other farm animals, farm workers and members of the farmer's family "without incident or hint of hostility . . . [and] had never acted in a way that put others at risk of harm" (*Bard*, 6 NY3d at 597).

The Court of Appeals then turned to Bard's alternative theory, sounding in negligence, that, because the bull was a breeding bull housed with a herd over which it exercised dominance, the farmer was negligent in failing to restrain the bull or warn newcomers of its presence. Bard had relied on two comments in Restatement (Second) of Torts § 518. The first, *"Knowledge of normal characteristics,"* provides that the keeper of a domestic animal is required to know the characteristics of that class of animal and to exercise suitable precautions. The second, *"Animals dangerous under particular circumstances,"* provides that the keeper is required to know that even ordinarily gentle animals are likely to be dangerous under particular circumstances, and to exercise reasonable care. Bulls are used as illustrations in both comments. (*See* Restatement [Second] of Torts § 518, Comments *g*, *h*.)

The Court of Appeals rejected Bard's negligence theory, on the ground that Bard's claim was tantamount to saying that the farmer should have known of the bull's vicious propensities

because breeding bulls are generally dangerous animals. The Court pointed out that we have never accepted such a theory of imputed knowledge of the vicious propensity of a particular breed or kind of animal (6 NY3d at 598-599). The Court then went on to state, unnecessarily, in my view, that "when harm is caused by a domestic animal, its owner's liability is determined *solely* by application of the rule articulated in *Collier* [1 NY3d at 446-447]" (*Bard*, 6 NY3d at 599 [emphasis added]), i.e. the rule of strict liability for harm caused by a domestic animal when the owner knew, or should have known, of the animal's vicious propensities.

In my view, and for the reasons stated in Judge R.S. Smith's dissent in *Bard* (*see* 6 NY3d at 602-603), it was wrong to reject negligence altogether as a basis for the liability of an animal owner. "[N]egligence by an owner, even without knowledge concerning a domestic animal's [vicious] propensity, may create liability" (*Hyland v Cobb*, 252 NY 325, 326-327 [1929], citing *Dickson v McCoy*, 39 NY 400 [1868]).

Nevertheless, because I believe that the majority of this Court in *Bard* intended to restrict liability for animal-induced injuries to circumstances where there is strict liability, I cannot accept the Appellate Division's position that the present case is distinguishable from *Bard* as a leash law negligence case. Consequently, I vote to reverse and, although I would not have joined the majority's opinion in *Bard*, I must, on constraint of that decision, concur in the majority's opinion in the present case.

Chief Judge LIPPMAN and Judges CIPARICK, GRAFFEO and JONES concur with Judge READ; Judge PIGOTT concurs in result in a separate opinion in which Judge SMITH concurs.

Order, insofar as appealed from, reversed, etc.