■ Robert Bloomer, Appellant, v Christine M. Shauger, Respondent. [942 NYS2d 277]—

Egan Jr., J. Appeal from an order of the Supreme Court (Zwack, J.), entered November 12, 2010 in Ulster County, which, among other things, granted defendant's motion for summary judgment dismissing the complaint.

In 2003, defendant acquired two American Quarter horses, Whiskey and Topper. The horses, previously owned by defendant's deceased brother, had been companions for more than two decades and, by all accounts, would become agitated whenever they were separated from one another. Additionally, according to defendant, Whiskey and Topper were "barn sour"—meaning that they would not go inside a barn or enclosed structure— and, as a result, were kept in a small paddock on defendant's property.

Topper unfortunately fell ill in January 2008 and, two months later, after discovering Topper unable to stand, defendant contacted her veterinarian and arranged to have him put down—a task performed inside the paddock and in full view of Whiskey. Shortly thereafter, defendant contacted her nephew, David Edwards, and asked that he assist her in burying Topper. Edwards, utilizing a skid steer equipped with a backhoe, thereafter began digging Topper's grave inside the paddock—where Whiskey still remained. During all of this, Whiskey was observed pacing back and forth, whinnying and searching for Topper.

Although the parties debate precisely what transpired next, defendant has assumed—for purposes of the underlying motions—that plaintiff's version of the ensuing events is true. In this regard, plaintiff—who lived next door—testified at his examination before trial that upon arriving home from work, he heard the sound of digging and walked over to defendant's property to see what was going on. Upon learning of Topper's passing and viewing the limited progress made by Edwards with the skid steer, plaintiff climbed aboard and finished digging the grave. As plaintiff prepared to inter Topper, Whiskey was "[f]rantically pacing" in the paddock, prompting defendant to

leave the area in search of a lead line.[1] While defendant was gone, plaintiff crouched down next to Topper and began petting him. This gesture seemed to calm Whiskey, who approached and rested her chin on plaintiff's left shoulder. As plaintiff reached up with his left hand and grasped Whiskey's halter, defendant approached, reached across both of them with the lead line in hand and spooked Whiskey, who pulled her head back. In the process, the middle finger of plaintiff's left hand caught in one of the metal rings on the halter, resulting in a significant injury that required surgical intervention.

Plaintiff thereafter commenced this action against defendant setting forth causes of action sounding in negligence and strict liability. Following joinder of issue and discovery, defendant moved for summary judgment dismissing the complaint. Plaintiff opposed the motion and cross-moved for summary judgment. Supreme Court thereafter granted defendant's motion and denied plaintiff's cross motion, prompting this appeal.

We affirm. Preliminarily, Supreme Court properly dismissed plaintiff's negligence claim as New York no longer "recognize[s] a common-law negligence cause of action to recover damages for injuries caused by a domestic animal" (*Curbelo v Walker*, 81 AD3d 772, 774 [2011]; *see Vichot v Day*, 80 AD3d 851, 852 [2011]).[2] Although this Court recently expressed its discomfort with this rule (*see Hastings v Sauve*, 94 AD3d 1171, 1173 [2012]) and defendant's conduct on the day in question indeed may have evidenced some negligence on her part (*see* n 5, *infra*), the Court of Appeals has made its position clear (*see Petrone v Fernandez*, 12 NY3d 546, 550 [2009]; *Bard v Jahnke*, 6 NY3d 592, 599 [2006]; *Collier v Zambito*, 1 NY3d 444, 446-447 [2004]); therefore, we are constrained to view this matter solely in the context of strict liability.

In this regard, "[i]t has long been the rule that the owner of a domestic animal who either knows or should have known of that animal's vicious propensities will be held liable for the harm the animal causes as a result of those propensities" (*Seybolt v Wheeler*, 42 AD3d 643, 644 [2007] [internal quotation marks and citations omitted]; *accord Barone v Phillips*, 83 AD3d 1523, 1523-1524 [2011]; *see Petrone v Fernandez*, 12 NY3d at 550). The term "vicious propensities," in turn, includes "the

---

1. Plaintiff was familiar with both Whiskey and Topper, having cleaned out their paddock and helped feed them while they were still owned by defendant's brother. Although plaintiff characterized the horses as skittish, he never observed either of them display any sort of aggressive behavior.

2. A horse is considered to be a domestic animal (*see* Agriculture and Markets Law § 108 [7]; *Krieger v Cogar*, 83 AD3d 1552, 1552 [2011]).

propensity to do any act that might endanger the safety of the persons and property of others in a given situation" (*Collier v Zambito*, 1 NY3d at 446 [internal quotation marks and citation omitted]; *accord Alia v Fiorina*, 39 AD3d 1068, 1069 [2007]). To that end, "an animal that behaves in a manner that would not necessarily be considered dangerous or ferocious, but nevertheless reflects a proclivity to act in a way that puts others at risk of harm, can be found to have vicious propensities—albeit only when such proclivity results in the injury giving rise to the lawsuit" (*Collier v Zambito*, 1 NY3d at 447; *accord Krieger v Cogar*, 83 AD3d 1552, 1553 [2011]; *Barone v Phillips*, 83 AD3d at 1524). The case law makes clear, however, that behavior that is normal or typical for the particular type of animal in question is insufficient to establish a vicious propensity (*see Illian v Butler*, 66 AD3d 1312, 1314 [2009]; *Earl v Piowaty*, 42 AD3d 865, 866 [2007]; *Seybolt v Wheeler*, 42 AD3d at 645; *Campo v Holland*, 32 AD3d 630, 631 [2006]), and an animal's "rambunctious behavior would show awareness of a vicious propensity only if it [was] the very behavior that resulted in [the] plaintiff's injury" (*Campo v Holland*, 32 AD3d at 631; *accord Earl v Piowaty*, 42 AD3d at 866; *Seybolt v Wheeler*, 42 AD3d at 644).

Here, regardless of whether Whiskey's demeanor on the day in question was the result of being separated from Topper or, rather, having witnessed firsthand his demise and the ensuing preparations for his burial, there is no dispute that she was nervous and agitated both prior to and following plaintiff's arrival, as evidenced by her whinnying and pacing inside the paddock.[3] There is nothing in the record to suggest, however, that Whiskey's whinnying and pacing constituted atypical equine behavior and, more to the point, it is clear that this behavior was not the cause of plaintiff's injury. Similarly, even if Whiskey's overall behavior that day could be characterized as rambunctious,[4] again, her generalized anxiety was not "the very behavior that resulted in plaintiff's injury" (*Campo v Holland*, 32 AD3d at 631; *see Barone v Phillips*, 83 AD3d at 1524).

Nor are we persuaded that Whiskey's history of avoiding a lead line rises to the level of a vicious propensity. To be sure, the record makes clear that Whiskey did not like being attached

---

**3.** Indeed, plaintiff submitted an affidavit from a veterinarian who suggested that Whiskey suffered from severe separation anxiety, as manifested by "a high degree of agitation marked by physical activity (pacing or running back and forth), vocalization (whinnying), and a general state of excitement."

**4.** Although Whiskey obviously was under some measure of stress, plaintiff nonetheless testified, as noted previously, that Whiskey seemed to calm down as he was petting Topper and was resting her chin on his shoulder immediately prior to his injury.

to a lead line, that defendant often had to hide the lead line in the sleeve of her jacket in order to successfully attach the line to Whiskey's halter and that, if Whiskey saw the lead line coming, she would turn and walk away.[5] Noticeably absent from the record, however, is any indication that Whiskey's avoidance of the lead line—either in general or in the particular manner in which she eluded it that day—was "abnormal to [her] class, another necessary characteristic of vicious behavior for the purpose of establishing liability" (*Krieger v Cogar*, 83 AD3d at 1553 [internal quotation marks and citation omitted]; *accord Tennant v Tabor*, 89 AD3d 1461, 1463 [2011]). To the contrary, Whiskey's veterinarian averred that Whiskey pulling her head back, which undeniably was the specific act that caused plaintiff's injury, constituted "normal behavior for any horse—and in fact a normal reaction for any animal—when a person reaches for the animal's throat or face." And, as noted previously, normal or typical animal behavior is not indicia of a vicious propensity (*see Illian v Butler*, 66 AD3d at 1314; *Earl v Piowaty*, 42 AD3d at 866; *Seybolt v Wheeler*, 42 AD3d at 645; *Campo v Holland*, 32 AD3d at 631). Moreover, although there is ample evidence in the record documenting Whiskey's tendency to avoid the lead line by walking away, there is nothing in the record to suggest that Whiskey had, on prior occasions, ever attempted to avoid a lead line by pulling her head back. For all these reasons, we are unable to conclude that Whiskey's tendency to avoid the lead line qualifies as "a proclivity to act in a way that puts others at risk of harm" (*Collier v Zambito*, 1 NY3d at 447; *see Smith v Reilly*, 17 NY3d 895, 896 [2011] [proof that dog barked and ran towards the road is insufficient to raise a question of fact as to dog's alleged propensity to interfere with traffic]; *Krieger v Cogar*, 83 AD3d at 1553 [colt's avoidance behavior was neither atypical nor a propensity that put others at a risk of harm]; *Alia v Fiorina*, 39 AD3d at 1069 [dog's tendency to run into the road was insufficient to raise a question of fact as to dog's propensity to interfere with traffic]).[6]

In light of the foregoing, we are satisfied that defendant dem-

---

**5.** Defendant admittedly testified at her examination before trial that Whiskey was upset on the day in question, that she knew she could not attach a lead line to Whiskey when the horse was agitated and, further, that each time she attempted to attach the lead line to Whiskey's halter that day, Whiskey became more and more upset. However, defendant's arguably questionable judgment in this regard is of no moment, as the issue is not what defendant should (or should not) have done but, rather, whether she knew or should have known of Whiskey's alleged vicious propensities.

**6.** To the extent that plaintiff relies upon an affidavit from a veterinarian who stated that American Quarter horses are "selectively bred to be able to rapidly go into reverse when called upon to do so," two observations are

onstrated her entitlement to summary judgment dismissing the complaint and, further, that the record as a whole fails to raise a question of fact as to Whiskey's alleged vicious propensity. Accordingly, defendant's motion was properly granted.

Lahtinen, J.P., Spain and Stein, JJ., concur.

Garry, J. (dissenting). I respectfully dissent, finding the majority analysis unduly narrow in defining the animal's known propensities relative to the manner of the injury. This horse, clearly in a highly agitated state at the time of the underlying events, had an established propensity for avoiding lead lines. When the owner approached with the lead line, the horse responded in a manner entirely consistent with this propensity by trying to avoid the lead line. The horse had previously "walked away" to avoid the lead line because it had apparently been free to do so. Here, however, plaintiff was restraining the horse with his hand in the halter; as it was unable to walk away, the horse instead "spooked" and "violently ripped his head back." The behavior at issue—avoiding lead lines—is nonetheless "the very behavior that resulted in plaintiff's injury" (*Earl v Piowaty*, 42 AD3d 865, 866 [2007] [internal quotation marks and citation omitted]; *see Seybolt v Wheeler*, 42 AD3d 643, 644 [2007]).

New York is apparently "the only state in the nation that rejects the rule set forth in the Restatement [Second] of Torts" regarding an owner's negligence as a ground for liability arising from the dangerous acts of animals (Miner, Outside Counsel, *When Animals Attack in New York*, NYLJ, Feb. 28, 2012, at 4, col 1; *see Bard v Jahnke*, 6 NY3d 592, 597-599 [2006]). As we are thus applying an extremely restrictive rule, we should not do so in an extremely restrictive manner. Accordingly, I would reverse that part of the order granting defendant's motion for summary judgment and allow the matter to proceed for determination of the contested factual issues.

Ordered that the order is affirmed, with costs.

---

worth noting. First, the trait identified in the affidavit submitted by plaintiff's veterinarian is not what occurred here; although Whiskey admittedly pulled her head back, she did not "rapidly go into reverse." Further, the case law makes clear that an animal's membership in a particular breed is insufficient to charge its owner with knowledge of any alleged vicious propensities associated therewith (*see Bard v Jahnke*, 6 NY3d at 599; *cf. Morse v Colombo*, 31 AD3d 916, 917-918 [2006]).