STEPHEN U. CADWELL, Respondent, v. MARKS ARNHEIM, Appellant.

1. DRIVING HORSES ON HIGHWAY — DUTY TO CONTROL THEM. A person driving horses upon a highway is not compelled by law to keep them absolutely under control, but is bound only to exercise that reasonable degree of diligence and care which a man of ordinary prudence might be expected to exercise under the same circumstances.

2. TRIAL — QUESTION FOR JURY — NEGLIGENCE. A question of negligence should not be submitted to a jury where the facts are equally consistent with the presence or the absence of negligence, or where the jury could do no more than surmise as to the negligence of the defendant.

3. NEGLIGENCE — EXPERT EVIDENCE. Mere opinions of skilled horsemen, who did not see the occurrence, to the effect that a runaway team could be guided, if not stopped, are not sufficient to make a case for the jury as to the negligence of an experienced coachman, who testifies with some corroboration, and without any contradiction, except by such opinions, that he kept his runaway team on the right side of the road until a curve to the right was reached, when all his efforts could not prevent the team from going straight ahead across the roadway and running into another team, where it is also shown that the horses, which are conceded

to be gentle, became unmanageable and ran away through fright caused by gravel or mud thrown against one of them by a passing trotting horse.

*Cadwell* v. *Arnheim*, 81 Hun, 39, reversed.

(Argued February 10, 1897; decided March 2, 1897.)

APPEAL from a judgment of the General Term of the Supreme Court in the first judicial department, entered October 19, 1894, which affirmed a judgment in favor of plaintiff entered upon a verdict, and also affirmed an order denying a motion for a new trial.

The nature of the action and the facts, so far as material, are stated in the opinion.

*Christopher Fine* for appellant. The plaintiff failed to prove any negligence on the part of the defendant or of his driver, or any facts which constituted a cause of action against the defendant. (*Gottwald* v. *Bernheimer*, 6 Daly, 212; *Quinlan* v. *S. A. R. Co.*, 4 Daly, 487; *Furlong* v. *B. & S. A. R. Co.*, 6 Daly, 214; *Albert* v. *B. S. R. Co.*, 2 Daly, 389; *Cotton* v. *Wood*, 8 C. B. [N. S.] 566; *Hammock* v. *White*, 11 C. B. [N. S.] 588; *Goodman* v. *Taylor*, 5 C. & P. 410; *Cox* v. *Burbridge*, 13 C. & B. [N. S.] 430; *Bigelow* v. *Read*, 51 Me. 325; 1 Thompson on Neg. 61, 62; *Brown* v. *Collins*, 53 N. H. 442; *Gray* v. *Tompkins*, 40 N. Y. S. R. 546.)

*A. R. Dyett* for respondent. The court properly refused to nonsuit the plaintiff when he rested his case, and also when the motion was renewed at the close of the evidence. (*S. & S. P. R. Co.* v. *Thatcher*, 11 N. Y. 112; *McCotter* v. *Hooker*, 8 N. Y. 497; *Colt* v. *S. A. R. R. Co.*, 49 N. Y. 671; *Brown* v. *M. R. R. Co.*, 1 How. App. Cas. 52–66; *Volkmar* v. *M. R. Co.*, 134 N. Y. 418; *Wolfkiel* v. *S. A. R. Co.*, 38 N. Y. 49; *Putnam* v. *B. & S. A. R. R. Co.*, 55 N. Y. 108; *A. Nat. Bank* v. *Wheelock*, 82 N. Y. 118; *Rehberg* v. *Mayor, etc.*, 91 N. Y. 138; *Durkin* v. *Sharpe*, 12 N. Y. Wkly. Dig. 421.) The motion for a nonsuit was properly denied, and so was the motion for a new trial on the minutes.

(*Volkmar* v. *M. R. Co.*, 134 N. Y. 418; *Wohlfahrt* v. *Beckert*, 92 N. Y. 490.) None of the defendant's exceptions to the court's charging the plaintiff's requests were well taken. (1 R. S. 695, § 1; S. & R. on Neg. §§ 650–652; *C., etc., R. R. Co.* v. *Grames*, 34 N. E. Rep. 613; 54 N. Y. 230; 1 E. D. Smith, 78; *Cooper* v. *E. T. Co.*, 75 N. Y. 116; *Spooner* v. *B. C. R. R. Co.*, 54 N. Y. 230; *Hickenbottom* v. *D., L. & W. R. R. Co.*, 122 N. Y. 91; *Caldwell* v. *N. J. S. Co.*, 47 N. Y. 282; *Losee* v. *Buchanan*, 51 N. Y. 492.)

GRAY, J. The plaintiff brought this action to recover damages from the defendant for injuries sustained by himself and to his horses and carriage, as the result of being run into by a pair of horses attached to a carriage, belonging to the defendant and driven by his coachman. The charge is that the horses and carriage were negligently driven by the defendant's servant, at the time. The defendant, in his answer, denied the negligence and set up in defense that the occurrence complained of was due to the horses having become frightened and unmanageable, and was without any fault on the part of himself, or of his servant. The trial of the issues resulted in the submission of the case to a jury, who returned a verdict for the plaintiff. From an affirmance by the General Term of the judgment entered upon the verdict, the defendant has appealed to this court.

The serious question, which is now presented to us upon this record, is whether the evidence justified the submission of the case to the jury. Viewing it in the light most favorable to the plaintiff, it seems impossible to resist the conclusion that he sustained the injuries to his person and property, of which he complains, through an inevitable accident and that, so far from the evidence disclosing some act of commission or of omission on the part of the defendant's coachman which permitted the occurrence, it shows that, though an experienced driver, he found himself unable to avoid running into the plaintiff's horses and carriage. The main facts are not disputed. In the afternoon of April 30th, 1891, the defend-

ant's coachman was driving a pair of horses attached to a victoria, in which were seated the defendant's wife and mother-in-law. They were upon what is known as the westerly drive of the Central park, in the city of New York, when a passing horse and wagon threw up some gravel or mud upon the nigh, or left-hand, horse of the defendant's pair; with the effect of so frightening him, that he kicked up and got his right hind leg over the carriage pole. Upon this happening, the pair of horses became unmanageable and ran away. They were proceeding in a northerly direction at the time and were upon the right-hand side of the road. In running away, they kept upon a straight line on the right side of the road, until they reached, after a run of two or three blocks, a part of the drive where it curved to the right hand. At that point the frightened horses, continuing in their straight course, crossed the driveway and kept on upon the left side. The plaintiff's horses and carriage were then coming south upon the drive, keeping to the right side of the road in that direction, and were first seen by the defendant's coachman when some two hundred feet apart and approaching each other head on. According to the plaintiff's account, he had no opportunity to get out of the way and was on the extreme right of the road. He said that the defendant's horses were running away when he first saw them ; but he did not know what had made them do so. The horses met head to head ; throwing the plaintiff's horses down and himself out of the carriage. The only other persons who could testify as to the runaway and the collision were the defendant's coachman and the two ladies in his carriage. It was conceded upon the trial that the defendant's horses were perfectly gentle, and they had been driven by the same coachman for a little over two years. There had been no previous experience with them, which indicated any disposition to run away, and everything about the harness and carriage was in proper shape and in good condition. The coachman was a man of about forty years of age and had been driving for over twenty-one years. He had driven for the defendant for something over four years and one of the plaintiff's own witnesses testi-

fied to his being a very skillful driver. At the time of the
trial he was not in the employment of the defendant. He
had remained in his employment for over a year after the
accident; but had, some months before the trial, retired upon
a farm which he had bought. He testified to the near, or left-
hand, horse of his pair having become frightened by being
struck with the gravel or mud thrown by the passing trotting
horse, to his horse's leg having caught over the carriage pole,
and to the pair, thereupon, running away. He said : " They
ran straight as far as the road was straight and then when
they came to the curve they went to the gutter. I tried with
all my might to pull them out of the gutter and could not do it.
*   *   * I kept them on my own side as far as the road went
straight, but when they came to the curve they went straight
on, and I could not get them out. They went to the gutter
and I pulled them, on the off horse, with all my might and I
could not get them out of there. I pulled and was pulling
and was doing all that I possibly could all the time to stop
them and steer them.   *   *   * When the team got into the
gutter on the left-hand side of the drive, I tried to pull them
out 'all I could and stop them; tried to get them back to my
own side. I first saw the plaintiff's team — Mr. Cadwell's
team — about a block, or a little over a block north.   *   *   *
These efforts on my part continued until I struck him — Mr.
Cadwell's team.   *   *   * From my experience as a driver
of coaches, horses attached to coaches, it was not possible for
any driver to have stopped that team in the condition it then
was. I had no premonition, or any notice of any kind, that
anything was going to occur to frighten either of my horses.
*   *   * My horses left the right side of the road and went
to the left at the place where the road got the bend. There
the horses ran right straight up. That point was about a
block and a half from where my team struck Mr. Cadwell's.
As near as I can tell, that is when my team struck the gut-
ter. I tried my best to pull them, to pull the off horse out,
and take the near side out of the gutter, but could not
do it. When I approached Mr. Cadwell, I had both hands

on the line, pulling my right-hand side the best I could ;
pulling my horses trying to get them to stop and trying
to get them out of the gutter; pulling to steer clear
of Mr. Cadwell and pulling to stop them. I had not got
them at all under control." In answer to the question, as
to whether it was possible for him to have stopped or con-
trolled his horses at the time they became frightened, or dur-
ing any of the time until the collision occurred, he answered,
" No." Without quoting further from his evidence, his testi-
mony is explicit and unvarying that his horses, having become
frightened, got beyond his control and that when the road
curved away to the right, the maddened horses kept on,
in the straight course which they had been running in, until
they struck the gutter on the other side of the driveway, and
that, at no time, before or after he saw the plaintiff coming in
his direction, was he able either to stop his horses, or to pull
them back over to the right-hand side of the road. His testi-
mony, that the nigh horse of his pair got his leg over the
carriage pole, was confirmed by one of the plaintiff's
witnesses, a park policeman named Murphy. Murphy was one
of the oldest mounted policemen in the park ; had been a
driver before joining the force and seems to have had a good
deal of experience in catching runaways in the park. He
described, particularly, the condition in which he found things
after the collision and could not be shaken in his statement
that the defendant's nigh horse had his right hind leg over
the pole. Upon having his attention called to a statement by
another witness, a park patrolman, that it was the off, or right-
hand, horse which had its hind leg over the pole, he replied :
" I guess he is no horseman. It is only a mistake of his."
The plaintiff made no attempt, later in the case, to affect, or
to correct, this evidence of Murphy. It must be regarded as
established in the case, that the cause of the runaway and the
condition of the nigh horse were as described by the coach-
man. The defendant's wife, also, gave corroborative testimony
as to the horses being frightened by the passing buggy and as
to the course pursued by them. She said the driver seemed

to be doing all that he could to control the horses, as to their speed and as to the direction in which they were going. The defendant's mother-in-law testified to the same effect and, also, to the horse on the left side having his leg over the carriage pole.

The theory of the plaintiff, in seeking to hold the defendant responsible for what occurred, was that the coachman might have so controlled his horses after they ran away as to avoid the collision. As it was said in the prevailing opinion at the General Term : " The defendant was not held responsible for the runaway, but for the negligence of his driver in not at the time properly guiding the horses." Acting upon that theory of the defendant's responsibility, the plaintiff introduced evidence by persons skilled in driving horses, to show that while runaway horses may not be stopped, yet that they can be guided. The admissibility of that kind of expert evidence was, perhaps, questionable ; but its presence cannot be said to affect the result in the present case. It was the object of the plaintiff to show by that sort of evidence that the coachman, finding himself carried to what was the wrong side of the road, under the established rule for driving upon the highway, was bound to guide his horses over to the right-hand side of the road, and that, by a proper effort to do so, he could have accomplished it.

If it could be said that this case depended upon the weight to be attached to the skilled opinions given upon either side, as to the possibilities for controlling or guiding runaway horses, we should not be disposed to interfere with the result reached in the trial court; but we find ourselves differing with the General Term justices below, in relation to the effect in this case of the evidence given by the expert horsemen, who were examined as witnesses. None of them witnessed the occurrence of this runaway and we are not disposed to hold that the opinions of such persons are sufficient to raise an issue as to the conduct of the defendant's coachman. Persons, who had seen what occurred and who had observed the acts of the coachman at the time, might, very

properly, give their testimony and, if it conflicted with that of the coachman, an issue would arise which only the jury should determine. But the evidence as to what the coachman did, given by himself and by the ladies in the carriage, was not contradicted and, admitting that the ladies may have been interested in giving their statements, or that they may have been incapable of seeing exactly what was done, the evidence of the coachman is not to be rejected, nor his credibility deemed to be affected, simply because of his connection with the matter. In addition to his evidence being uncontradicted, the circumstances were such as to give to it every element of veracity. Not only his own safety, but that of the ladies in his care and of those upon the highway, were involved in the result of his efforts to control the maddened horses and he possessed the skill of an experience of twenty-one years.

The question before the trial court was as to the responsibility of the defendant for the damage sustained by the plaintiff in this collision. There is no rule of law, which compels a person driving horses upon a highway absolutely to keep them under control. He is bound only to exercise that reasonable degree of diligence and care, which a man of ordinary prudence might be expected to exercise under the same circumstances. If the servant of the master is driving, the latter is, of course, responsible for the omission by his servant of the diligence and care exacted by the rule. The legal duty owing by the defendant to the plaintiff was that his coachman should be competent and should, to the best of his ability, so manage his horses, while upon the public highway, as to prevent them from being the cause of any injury to those rightfully there. Incompetency, due to the want of experience, or to other causes affecting the personality of the driver; or recklessness in driving, whether in maintaining an improper rate of speed, or in failure to exercise proper skill and vigilance; or the use of horses known to be vicious and unreliable in harness; these and, possibly, other conditions should ordinarily exist in order to predicate negligence of one driving upon the public way.

In the course of the affairs of life, accidents must happen and if they are not attributable to the breach of some legal duty owing to the sufferer, he is without legal right to complain. In actions for the recovery of damages, charged to the negligent acts of a defendant, it must appear that there has been some breach of duty on his part, or of those towards whom he stands in the position of a master, and affirmative proof must be given, which shows, or tends to show, the negligence of the master or the servant. It will not do to submit a question of negligence to a jury, where the facts are equally consistent with the presence or the absence of negligence; or where the jury could do no more than surmise as to the negligence of the defendant. The difficulty with the plaintiff's case was that the facts failed either to disclose any fault in the driver of the defendant's horses, or to warrant a jury in deciding that he could have controlled the action of the frightened animals. There was absolutely no evidence on the part of the plaintiff to show that the defendant's servant was negligent in the performance of any duty; unless the opinions of persons, who were not witnesses of the occurrence, as to what a driver might have done in such an emergency, can be regarded as such evidence; and that we are not prepared to hold. On the other hand, there was the testimony of the coachman himself, which was not shaken, or affected as to its credibility, by the evidence of any facts, to the effect that all his efforts to stop, or to direct, the horses, were futile. With that evidence in the case, slightly corroborated as it was by that of the ladies in the carriage, it was error to deny the motion made on behalf of the defendant for a nonsuit. To submit the case to the jury, under the evidence, was to invite their speculation upon the question; with nothing in the facts to militate against the truth of the coachman's statements. It was more than permitting them to surmise as to the negligence of the defendant's servant; it was permitting them to decide that question adversely to him, in the face of the positive testimony and upon opinion evidence of little, if of any, value, under the circumstances.

For the error in refusing to nonsuit the plaintiff, there

should be a reversal of the judgment and a new trial of the action.

The judgment appealed from should be reversed and a new trial ordered ; with costs to abide the event.

All concur.

Judgment reversed.