Flanders v Goodfellow (2025 NY Slip Op 02261)

Flanders v Goodfellow

2025 NY Slip Op 02261

Decided on April 17, 2025

Court of Appeals

Halligan, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the Official Reports.

Decided on April 17, 2025

No. 29 

[*1]Rebecca M. Flanders, Appellant,
v
Stephen F. Goodfellow et al., Respondents.

Matthew J. Kaiser, for appellant.
Michael F. Perley, for respondents.

HALLIGAN, J.

Plaintiff Rebecca Flanders, a postal carrier, was bitten by a dog owned by Defendants Stephen and Michelle Goodfellow while delivering a package to their residence. She commenced this action to recover damages for her injuries, asserting causes of action sounding in strict liability and negligence. Both causes of action were dismissed, and Flanders asks us to reinstate them.
Under settled law, an owner of a domestic animal who has actual or constructive knowledge of their animal's vicious propensities will be held strictly liable for harm caused as a result of those propensities. There is a triable issue of fact as to whether the Goodfellows had constructive knowledge of their dog's vicious propensities, and so summary judgment should not have been granted to them on the strict liability cause of action.
The lower courts dismissed Flanders's negligence cause of action as barred by Bard v Jahnke (6 NY3d 592 [2006]), which held that there can be no common-law negligence liability when a domestic animal causes harm. Experience has shown that this rule is in tension with ordinary tort principles, unworkable, and, in some circumstances, unfair. Continued adherence to Bard therefore would not achieve the stability, predictability, and uniformity in the application of the law that the doctrine of stare decisis seeks to promote. Accordingly, we overrule Bard to the extent that it bars negligence liability for harm caused by domestic animals, and reinstate Flanders's negligence cause of action.
I
At this stage of the litigation, we must view the record evidence in the light most favorable to Flanders. On December 8, 2018, Flanders arrived at the Goodfellows' house to deliver mail, but found their mailbox missing. She pulled her vehicle into the horseshoe driveway to leave a package on the Goodfellows' porch and, as she did so, heard a dog barking. She had not seen a warning that the Goodfellows had a dangerous dog either at the post office or on the scanner given to postal carriers, and she did not see a "beware of dog" sign on the property. After waiting a moment to confirm the barking dog was not outside, Flanders exited her vehicle.
Stephen Goodfellow opened the door to meet Flanders on the porch. As she handed him the package and began to tell him that the mailbox was down, Flanders heard the sound of nails "ticking" on a hardwood floor and saw a large dog approaching the door from inside the house. The dog slipped past Stephen through the open door and, as Stephen yelled its name, lunged towards Flanders's neck. Flanders raised her hand to cover her face and neck. The dog bit her shoulder, latching its teeth into her flesh and breaking skin. With the package still in hand, Stephen tugged at the dog to release its hold. When he managed to break the dog's grip, Flanders went directly to her vehicle without looking back. She later learned that the dog bite had caused a "snap tear" in her shoulder muscle, an injury that required multiple surgeries and resulted in permanent scarring.
Discovery yielded further evidence about the dog and its prior behavior. The dog was about 70 pounds at the time of the incident, and had been acquired by the Goodfellows as a puppy several years earlier. The dog "yank[ed] people around" when leashed, once even "dragg[ing] Michelle to the ground." The Goodfellows hired a dog trainer, and after a two-week session, Michelle posted on social media that their dog could now run "off leash in the yard," was no longer "jumping," and "tolerate[d] other moving critters." The trainer testified that although the dog did not exhibit aggressive tendencies toward people, it did get into a "scuffle" with another "alpha" dog. Michelle testified that when people whom the dog knew visited the house, it "would jump up to greet the person" as a "sign of affection." She also said the dog did not interact with strangers because they did not enter the house. Stephen testified that he had never seen the dog growl or bare its teeth, and that no one had ever complained to him about the dog prior to the incident.
Flanders produced sworn affidavits from two postal workers who had delivered mail to the Goodfellows' residence over a period of several years. One of them said that when he approached the house, the Goodfellows' dog "would actually bite the window, as though it was trying to bite you," causing its "saliva [to] project onto the window." The dog would bare its teeth "during these episodes, and it barked, snarled, and growled. It also slammed into the window glass, as though it was trying to get through and attack." The worker asserted that the Goodfellows' dog was "the most aggressive" he had ever encountered on his routes, and he was "sure" that "if the dog's owners were home when these deliveries occurred or they have surveillance footage of the dog's actions during these deliveries, they knew or should have known the dog was aggressive or dangerous before the attack."
The other postal worker testified to similar experiences with the dog. He said that nearly every time he delivered a package to the front porch, he could see the dog through the glass windows on either side of the door. It "was extremely loud, barking and snarling, and slamming its face and head into the glass in what looked to be an attempt to attack [him] through the glass." He "believe[d] that home residents would have witnessed the dog's behavior," noting that the dog "was extremely loud and created a huge ruckus such that anybody home would have known of it." Although he thought "the dog was dangerous," the worker said that he did not report its aggressive behavior because he "did not believe the dog posed a risk of danger to me based on the horseshoe driveway and an ability to make a quick exit if necessary."
Following discovery, Supreme Court awarded summary judgment to the Goodfellows and dismissed the claim. With respect to strict liability, the court concluded that the evidence created no triable issue of fact as to whether the Goodfellows had actual or constructive knowledge of the dog's alleged vicious propensity, which is an essential element of a strict liability cause of action. The court considered the affidavits from the postal workers, but found them insufficient because they did not show that the Goodfellows were home while the dog acted aggressively towards postal workers or that the Goodfellows otherwise knew about the dog's behavior. The court also dismissed Flanders's negligence cause of action under Fourth Department precedent foreclosing such liability for harms caused by domestic animals.
The Appellate Division affirmed (215 AD3d 1248 [4th Dept 2023]). It determined that the Goodfellows had demonstrated that they neither knew nor had reason to know of the dog's allegedly vicious propensity, and that Flanders had failed to raise a dispute of fact that required a trial on the strict liability cause of action. The Court further held that Flanders's negligence cause of action was properly dismissed.
We granted Flanders leave to appeal (40 NY3d 904 [2023]).
II
We begin with Flanders's strict liability cause of action. CPLR 3212 (b) provides that a motion for summary judgment "shall be granted if, upon all the papers and proof submitted, the cause of action or defense shall be established sufficiently to warrant the court as a matter of law in directing judgment in favor of any party." A court reviewing a motion for summary judgment must view the facts "in the light most favorable to the non-moving party" (Ortiz v Varsity Holdings, LLC, 18 NY3d 335, 339 [2011]), and it may not "make credibility determinations or findings of fact" (Vega v Restani Constr. Corp., 18 NY3d 499, 505 [2012]). A motion for summary judgment may be granted only if the movant "tender[s] sufficient evidence to demonstrate the absence of any material issues of fact" and, once this prima facie showing is made, the non-movant fails "to produce evidentiary proof in admissible form sufficient to establish the existence of material issues of fact which require a trial of the action" (Alvarez v Prospect Hosp., 68 NY2d 320, 324 [1986]).
The contours of our "long-standing rule" of strict liability are not in dispute (Bard, 6 NY3d at 596). We have held that "the owner of a domestic animal who either knows or should have known of that animal's vicious propensities will be held liable for the harm the animal causes as a result of those propensities" (Collier v Zambito, 1 NY3d 444, 446 [2004], citing Restatement [Second] of Torts § 509). A vicious propensity includes "the propensity to do any act that might endanger the safety of the persons and property of others in a given situation" (id. [internal quotation marks omitted]). Once an owner's actual or constructive knowledge of their animal's vicious propensities is established, the owner "faces strict liability for the harm the animal causes as a result of those propensities" (id. at 448).
Two additional points have informed our applications of the strict liability rule. First, although knowledge of vicious propensities "may of course be established by proof of prior acts of a similar kind of which the owner had notice," a triable issue of fact "might be raised—even in the absence of proof that the dog had actually bitten some-one—by evidence that it had been known to growl, snap or bare its teeth" (id. at 446-447; see also Bard, 6 NY3d at 597). Second, we have held that a "vicious propensity" should be understood to include "any behavior that 'reflects a proclivity to act in a way that puts others at risk of harm' " (Hastings v Sauve, 21 NY3d 122, 125 [2013], quoting Bard, 6 NY3d at 597).
Contrary to the determination of the courts below, we conclude that the record evidence creates a triable issue of fact as to whether the Goodfellows had constructive knowledge of their dog's propensity to bite. In separate affidavits, the postal workers stated that anyone in the Goodfellows' home would have been aware of the dog's aggressive behavior, which included growling, snarling, barking, slamming into windows, and trying to bite at the postal workers through the glass. Although the Goodfellows contended that they did not know of the dog's behavior and emphasized that the postal workers did not report the dog's behavior to them or the post office, that response merely presents questions of credibility about the Goodfellows' claimed ignorance of the dog's behavior and the postal workers' reasons for not reporting it. Moreover, the Goodfellows admitted that the dog got into a fight with another dog during its brief stint with its trainer, and Michelle testified that the dog had not previously interacted with strangers because they were not allowed in the house, without explaining whether concerns about the dog prompted that practice. Given all of this evidence, we conclude that there is a triable issue of fact as to whether the Goodfellows should have known that the dog's behavior "reflect[ed] a proclivity to act in a way that puts others at risk of harm" (Collier, 1 NY3d at 447). This question of fact precludes a grant of summary judgment for the Goodfellows on the strict liability cause of action and requires its reinstatement.
III
We now turn to Bard, which held that a negligence cause of action is not available for harm caused by a domestic animal (see 6 NY3d at 597). Plaintiff Bard was a carpenter hired on short notice to repair damaged cow mattresses in the "low cow district" of a dairy barn housing several hundred cows. One of the defendants, another carpenter who did not own animals on the farm but regularly did odd jobs there, showed the plaintiff to that section of the barn, pointed out the mattresses that needed repair, and then left the barn. Neither he nor the defendant farm owner warned Bard that a breeding bull was permitted to roam freely around that section in order to impregnate cows. As Bard was fixing the mattresses, the bull charged, struck Bard in the chest, and repeatedly slammed him into the pipes of the stall, leading to serious injuries.
Bard argued that the defendants were negligent in failing to restrain the bull or warn strangers of its presence. As detailed in our opinion, Bard relied on several comments to the Restatement (Second) of Torts § 518, which [*2]addresses negligence liability for harm done by domestic animals that are not "abnormally dangerous": Comment g, which notes that the requisite care that must be exercised to control a domestic animal is tied to the characteristics "normal to its class" and that the owner must know those characteristics, and Comment h, which provides that the owner of a domestic animal must "realize that even ordinarily gentle animals are likely to be dangerous under particular circumstances and to exercise reasonable care to prevent foreseeable harm." Bard argued that "bulls, in particular breeding bulls, are generally dangerous and vicious animals," and the defendants therefore "should have restrained the bull or warned Bard of its presence" (Bard, 6 NY3d at 596 [internal quotation marks omitted]).
Bard thus presented the question whether a plaintiff may recover in negligence against the owner of a domestic animal that causes harm. Our case law did not offer a definitive answer (see e.g. Dickson v McCoy, 39 NY 400 [1868] [indicating that a negligence cause of action is available for harms caused by horses and cows running loose in the street]; Muller v McKesson, 73 NY 195 [1878] [permitting recovery in negligence for harm caused by a dog known to be vicious]; Brice v Bauer, 108 NY 428 [1888] [same]; Cadwell v Arnheim, 152 NY 182 [1897] [holding that a negligence cause of action is available where defendant negligently drove a team of horses on a public roadway]; Benoit v Troy & Lansingburgh R.R. Co., 154 NY 223 [1897] [same]; Miller v Blood, 217 NY 517 [1916] [indicating that negligence is available for harm caused by a horse known to have a habit of kicking]; Hosmer v Carney, 228 NY 73 [1920] [holding that the owner of a kicking horse is not liable in negligence without proof he knew or should have known of its vicious propensities]; Hyland v Cobb, 252 NY 325, 326-327 [1929] [noting that "negligence by an owner, even without knowledge concerning a domestic animal's evil propensity, may create liability"]; Kennet v Sossnitz, 260 AD 759 [1st Dept 1940] [indicating that strict liability is the proper theory of recovery for a dog bite], affd 286 NY 623 [1941 per curiam]; Brown v Willard, 278 AD 728 [3d Dept 1951] [same], affd 303 NY 727 [1951]; Young v Wyman, 76 NY2d 1009, 1010 [1990] [suggesting that harm caused by a dog loose in the street might support a negligence cause of action]; see also Vrooman v Lawyer, 13 Johns 339, 339 [Sup Ct 1816] [holding that owner of a bull that gored a horse not liable in negligence "without proof that he knew the animal was accustomed to do mischief"]; Smith v Farner, 229 AD2d 1017, 1017-1018 [4th Dept 1996] [holding that only strict liability is available for a dog bite]; Shaw v Burgess, 303 AD2d 857, 859 [3d Dept 2003] [same]).
Against this backdrop, we held in Bard that a plaintiff cannot "recover under a common-law cause of action for negligence, as expressed in Restatement (Second) of Torts § 518, Comments g and h" (6 NY3d at 597). This theory of liability, we stated, was "no different from arguing that [an owner] was negligent in that he should have known of [his animal's] vicious propensities" based on its class—a theory of constructive knowledge we described as foreign to our case law (id. at 598-599). Instead, "when harm is caused by a domestic animal, its owner's liability is determined solely by application of the rule articulated in Collier" (id. at 599)—that is, the rule of strict liability for harm caused by a domestic animal whose owner knows or has reason to know of the animal's vicious propensity. On that basis, we affirmed the dismissal of the negligence cause of action against both the owner of the bull and the non-owner contractor who had taken Bard to the barn.
Even though our decision focused on the specific Restatement comments relied upon by plaintiff, other rulings in Bard's immediate wake confirmed that it foreclosed the possibility of recovering for the negligence of a domestic animal owner. In Bernstein v Penny Whistle Toys, Inc., we cited Bard in holding that a plaintiff could not recover for injuries caused by a dog bite, absent evidence "that the dog's owner had any knowledge of its vicious propensities" (10 NY3d 787 [2008]; see also Bloomer v Shauger, 21 NY3d 917 [2013] [same]). The following year, we reiterated in Petrone v Fernandez that "negligence is no longer a basis for imposing liability after . . . Bard" (12 NY3d 546, 550 [2009] [internal quotation marks omitted]).
Flanders asks us to overrule that aspect of Bard and to recognize negligence as an alternative to strict liability for injuries caused by domestic animals.
A
We must first consider whether stare decisis counsels continued acceptance of Bard. As we long have recognized, this bedrock principle " 'holds that common-law decisions should stand as precedents for guidance in cases arising in the future' and that a rule of law 'once decided by a court, will generally be followed in subsequent cases presenting the same legal problem' " (People v Peque, 22 NY3d 168, 194 [2013], quoting People v Damiano, 87 NY2d 477, 488 [1996, Simons, J., concurring]). The doctrine " 'is the preferred course because it promotes the evenhanded, predictable, and consistent development of legal principles, fosters reliance on judicial decisions, and contributes to the actual and perceived integrity of the judicial process' " (People v Taylor, 9 NY3d 129, 148 [2007], quoting Payne v Tennessee, 501 US 808, 827 [1991]). "Its purpose is to promote efficiency and provide guidance and [*3]consistency in future cases by recognizing that legal questions, once settled, should not be reexamined every time they are presented" (People v Bing, 76 NY2d 331, 338 [1990]). In light of these concerns, we will overrule a prior decision only "in the rarest of cases" (Matter of Brooke S.B. v Elizabeth A.C.C., 28 NY3d 1, 23 [2016]).
But rarely does not mean never. "Stare decisis is not an inexorable command" (Payne, 501 US at 828). Rather, it " 'is a principle of policy and not a mechanical formula of adherence to the latest decision, however recent and questionable' " (People v Bing, 76 NY2d at 338, quoting Helvering v Hallock, 309 US 106, 119 [1940]). "Although a court should be slow to overrule its precedents, there is little reason to avoid doing so when persuaded by the 'lessons of experience and the force of better reasoning' " (id., quoting Burnet v Coronado Oil & Gas Co., 285 US 393, 407-408 [1932, Brandeis, J., dissenting]). That may be especially true of "[t]ort cases," including "personal injury cases," which "offer an[ ] example where courts will, if necessary, more readily re-examine established precedent to achieve the ends of justice" (People v Hobson, 39 NY2d 479, 489 [1976]). Thus, where we have concluded that a "rule of nonliability is out of tune with the life about us, at variance with modern-day needs and with concepts of justice and fair dealing," we have overruled it (Bing v Thunig, 2 NY2d 656, 667 [1957], overruling Schloendorff v Society of N.Y. Hosp., 211 NY 125 [1914]; see also Woods v Lancet, 303 NY 349 [1951], overruling Drobner v Peters, 232 NY 220 [1921]).
Our decisions have examined various interrelated factors in deciding whether to overrule a precedent. One consideration is whether the decision is well-reasoned and consistent with relevant general principles of law (see Matter of Brooke S.B., 28 NY3d at 23-24). More specifically, we have held that if a recent precedent "fits uncomfortably into our tort jurisprudence," that tension may be a reason to abandon its decisional law (Broadnax v Gonzalez, 2 NY3d 148, 154 [2004]). Also relevant is whether legal developments in the doctrine undermine an earlier decision (see People v Bing, 76 NY2d at 342). Finally, we may consider how courts grapple with a decision over time—for example, whether it is "unworkable," "creates more questions than it resolves," or "no longer serves the ends of justice" (Peque, 22 NY3d at 194 [internal quotation marks omitted]).
Taking full account of these factors, along with the abiding values that stare decisis seeks to promote, we conclude that the time has come to set aside Bard's rule that an owner of a domestic animal may not be held liable in negligence for harms caused by their animal.
1
Tort law seeks to incentivize us to be mindful of the risk that our behavior might harm others by imposing a duty to act with due care. That is why, under ordinary principles of negligence, a victim may seek recovery by proving that a defendant failed to exercise due care and thereby proximately caused a victim's injuries. Chief Judge Cardozo laid down the canonical formulation in Palsgraf: "Negligence is the absence of care, according to the circumstances" (Palsgraf v Long Is. R.R. Co., 248 NY 339, 341 [1928] [internal quotation marks omitted]; cf. Restatement [Third] of Torts: Liability for Physical and Emotional Harm § 3 ["A person acts negligently if the person does not exercise reasonable care under all the circumstances."]). As our case law makes clear, these principles apply to persons engaged in quite a wide array of activities—just to name a few, riding a bike (see e.g. Avery v New York, Ontario & W. Ry. Co., 205 NY 502 [1912]), driving a car (see e.g. Healy v Rennert, 9 NY2d 202 [1961]), and manufacturing factory machinery (see e.g. Robinson v Reed-Prentice Div. of Package Mach. Co., 49 NY2d 471 [1980]). A single idea unites these decisions: when people go about their daily lives, the law generally requires them to take reasonable steps to prevent foreseeable harm.
By exempting owners of domestic animals from negligence liability, Bard departed from these principles, and the standard incentives of our tort system, in several respects. For one thing, foreclosing negligence liability shifts both the burden of due care and cost of injuries away from owners of domestic animals to parties injured by those animals. And by allowing liability only upon proof that the owner had actual or constructive knowledge of a vicious propensity, the rule gives owners of domestic animals little reason to familiarize themselves with any potential proclivities that might lead the animal to cause harm, and in turn, to take reasonable steps to prevent any harm that may result.
This position made New York an outlier. At that time, the contrary view had been adopted by the Restatement and "almost every other state that ha[d] considered the question" (Bard, 6 NY3d at 603 [R.S. Smith, J., dissenting]; see also Restatement [Second] of Torts § 518). Today, the endorsement of the Restatement approach by other jurisdictions is even more sweeping. As of 2015, "some 36 states expressly recognize[d] negligence as a distinct, alternative theory for animal-induced injuries," and "18 expressly adopt[ed] or approvingly cite[d] the Restatement (Second) of Torts § 518" (Doerr v Goldsmith, 25 NY3d 1114, 1148-1149 [2015, Fahey, J., dissenting]). [*4]So far as we can tell, those numbers have not changed. Nor have any of the "remaining 14 states . . . expressly rejected the Restatement approach" (id. at 1149 [Fahey, J., dissenting]).
2
As a Judge of this Court explained, Bard's primary virtue is that it "provides an easy-to-apply bright-line rule that consistently proves fatal to negligence claims arising from injuries caused by certain animals" (id. at 1135 [Abdus-Salaam, J., concurring]). Whatever advantages of certainty were offered by Bard's bright-line rule, they have been much eroded by later decisions that carve out various exceptions to a blanket preclusion of negligence liability.
Seven years after Bard, we recognized an exception for harm caused by a wandering animal. In Hastings v Sauve, a cow crossed a neglected fence and ended up on a public road; the plaintiff then ran into the cow while driving down the road. We carved "wandering animals" out from Bard's no-negligence rule and allowed the case to proceed because it did not involve a vicious propensity and was thus "fundamentally distinct from the claim made in Bard" (21 NY3d at 125). We reasoned that denying negligence liability would "immunize defendants who take little or no care to keep their livestock out of the roadway or off of other people's property" (id.). We therefore held that "the owner of an animal may be liable under ordinary tort-law principles when a farm animal . . . is negligently allowed to stray from the property on which the animal is kept" (id. at 125-126).
Hastings defined "farm animals" with reference to a statutory provision that includes cows, domesticated horses, ducks, geese, and other fowl, expressly leaving open whether the so-called "wandering animal" rule "applies to dogs, cats or other household pets" (id. at 126, citing Agriculture and Markets Law § 108 [7]). We resolved that question two years later in Doerr v Goldsmith, announcing that dogs are "not domestic farm animals subject to an owner's duty to prevent such animals from wandering unsupervised off the farm" (25 NY3d at 1116). Our case law had evolved from a blanket no-negligence rule for domestic animals to a rule that some wandering animals could give rise to a negligence action.
Other decisions narrowed Bard in a different respect. Even though Bard itself had concluded that a non-owner (a third-party contractor) could not be held liable in negligence for harm caused by the bull, we later determined that Bard provided a safe harbor from negligence liability only for the owner of the domestic animal. That was implicit in Bernstein, where we dismissed a negligence cause of action against a non-owner defendant—an adult who had taken the child to the store and allowed her to interact with the dog—on the ground that there was "no evidence [the] third-party defendant was negligent" (10 NY3d at 788). Then, in Hewitt v Palmer Veterinary Clinic, we concluded that veterinary clinics could be held liable in negligence. We observed that such clinics are "in the business of treating animals and employ[ ] veterinarians equipped with specialized knowledge and experience concerning animal behavior" (35 NY3d at 548-549). Thus, we concluded, a clinic is "uniquely well-equipped to anticipate and guard against the risk of aggressive animal behavior that may occur in their practices" (id. at 549). Given that expertise, we held that a clinic "does not need the protection afforded by [Bard's] vicious propensities notice requirement" and may be held liable in negligence for harm caused by animals in their care (id.).
These developments confirm that Bard's bright-line rule has been muddied by various carve-outs that allow negligence liability against owners of domestic animals. The availability of a negligence action appears increasingly unpredictable, perhaps constrained only by the creativity of lawyers seeking recovery for those harmed by a domestic animal. The benefits the Bard court anticipated from its blanket preclusion of negligence liability have been much diminished by the subsequent exceptions to the rule.
3
Bard's decision to foreclose negligence liability laid bare a fundamental question: "Why should a person who is negligent in managing an automobile or a child be subject to liability, and not one who is negligent in managing a horse or bull?" (6 NY3d at 602 [R.S. Smith, J., dissenting]). That question is essentially one of fairness: why should someone harmed by a domestic animal bear the risk—and the cost—of injury, provided that the animal's owner did not know or have reason to know of a vicious propensity? Granted, this issue was apparent when Bard was decided. But it has continued to trouble both this Court and the lower courts. In some instances, we have carved out ad hoc exceptions to Bard's no-negligence rule, and lower courts have either done the same or voiced significant concern with our doctrine. These cases confirm that precluding negligence liability has proven unworkable, and at times unjust.
Several lower court decisions sought to narrow or distinguish Bard, only to wind up before this Court (see 25 NY3d at 1154-1155 [Fahey, J., dissenting], citing Bernstein v Penny Whistle Toys, Inc., 40 AD3d 224, 227 [1st Dept 2007, Saxe, J., dissenting in part], Petrone v Fernandez, 53 AD3d 221, 225-226, 228 [2d Dept 2008], Hastings v Sauve, 94 AD3d 1171, 1173 [3d Dept 2012], and Bloomer v Shauger, 94 AD3d 1273, 1274 [3d Dept 2012]). Other lower court cases "expressed serious discomfort with Bard, distinguished the case, or attempted to use the Hastings exception as a means of alleviating the limits of Bard" (id. at 1154 [Fahey, J., dissenting], citing Krieger v Cogar, 26 Misc 3d 1225[A], 2010 NY Slip Op 50259[U] [Sup Ct, Niagara County 2010], Jetter v Hall, 20 Misc 3d 306, 308-309 [Sup Ct, Monroe County 2008], and Cappellino v Lake Huntington Summer Community Inc., 46 Misc 3d 486, 490-491 [Sup Ct, Kings County 2014]). More recent cases have continued this trend. For example, in Scavetta v Wechsler, the Appellate Division, "constrained" by Bard, reached the "most unsatisfactory" conclusion that no negligence cause of action was available for a plaintiff struck by a metal bicycle rack that a dog dragged into a busy city street (149 AD3d 202, 210, 212 [1st Dept 2017]); see also id. at 211 [noting "the harshness of the Bard rule"]; Medina v Romanofsky, 57 Misc 3d 1207[A], 2017 NY Slip Op 51320[U], *3 [Civ Ct, Richmond County 2017] ["Why do we deny a person suffering an injury from an unleashed dog his or her day in court when if treated like similar situations, the trier of fact would determine whether the incident was caused by 'dogs just being dogs' or the failure of the owner to supervise his or her pet?"]).
In sum, the courts of this State have struggled with the bar on negligence actions against owners of domestic animals, and we have recognized multiple exceptions for the sake of fairness. In this respect, experience has shown Bard and its progeny to be an obstacle in "the path of justice" (Woods, 303 NY at 355 [internal quotation marks omitted]). And the passage of time has also shown us that Bard has "failed to achieve the efficiency, consistency and uniformity in the application of the law which the doctrine of stare decisis seeks to promote" (People v Bing, 76 NY2d at 348).
These considerations satisfy us that stare decisis does not counsel continued adherence to our restriction on negligence liability. Thus, to the extent we previously held that a plaintiff may not assert a common-law negligence cause of action against the owner of a domestic animal for harms caused by that animal, we now overrule that precedent.
B
Our decision today means that there is a two-pronged approach to liability for harms caused by animals, as set forth in sections 509 and 518 of the Restatement (Second) of Torts (see Matter of Sage Realty Corp. v Proskauer Rose Goetz & Mendelsohn, 91 NY2d 30, 34-37 [1997]). A plaintiff who suffers an animal-induced injury therefore has a choice. If the owner knew or should have known the animal had vicious propensities, the plaintiff may seek to hold them strictly liable. Or they can rely on rules of ordinary negligence and seek to prove that the defendant failed to exercise due care under the circumstances that caused their injury. Of course, a plaintiff might also assert both theories of liability, as Flanders chose to do.
The courts below dismissed Flanders's negligence cause of action solely on the ground that it was barred by Bard. That left them with no reason to consider whether the evidence raised a triable issue of fact regarding this cause of action. Nor have the parties argued this point in any detail. We therefore think it appropriate to afford the parties a full opportunity to litigate whether the evidence adduced in the record could support Flanders's negligence cause of action, and to allow Supreme Court to decide in the first instance whether it may proceed.
***
Accordingly, the order of the Appellate Division should be reversed, with costs, and the defendants' motion for summary judgment denied.
Order reversed, with costs, and defendants' motion for summary judgment denied. Opinion by Judge Halligan.Chief Judge Wilson and Judges Rivera, Garcia, Singas, Cannataro and Troutman concur.
Decided April 17, 2025